1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALMAN DENKHA,<br><br>                    Plaintiff,<br><br>     v.<br><br>MICHAEL J. ASTRUE, Commissioner<br>of Social Security,<br><br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1:04-cv-06708 AWI JMD

FINDINGS AND RECOMMENDATION
REGARDING PLAINTIFF'S
SOCIAL SECURITY COMPLAINT

## **BACKGROUND**

Plaintiff Salman Denkha ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable John M. Dixon, Jr., United States Magistrate Judge, for findings and recommendation to the District Court.

## **FACTS AND PRIOR PROCEEDINGS[1]**

On March 8, 1999, Plaintiff filed an application for SSI payments.  AR 14, 75.  He alleged disability since December 11, 1998, due to left leg pain, lower back pain and heart

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

surgery.  AR 75, 93.  After being denied both initially and upon reconsideration, Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ").  AR 56-59, 62-65, 66.  On

November 30, 2000, ALJ James N. Baker held a hearing.  AR 24-53.  ALJ Baker denied benefits

on January 23, 2001.  AR 11-20.  On September 13, 2002, the Appeals Council denied Plaintiff's

request for review.  AR 5-7.  Plaintiff appealed to the federal district court.

During the appeal process, Plaintiff filed a second application for SSI payments on March

16, 2001, alleging disability since January 24, 2001.  AR 616, 642.  After being denied both

initially and on reconsideration, Plaintiff requested a hearing before an ALJ.  AR 596-599, 603-

606, 607.  On January 29, 2003, ALJ Baker held a hearing on Plaintiff's second application for

SSI benefits.  AR 517-553.  ALJ Baker denied benefits on April 25, 2003.  AR  471-482.

In May 2003, on the parties' stipulation, the district court issued an order on Plaintiff's

first application for benefits and directed that the action be remanded to the Commissioner of

Social Security for further administrative proceedings.  AR 483-486.  On June 27, 2003, the

Appeals Council issued an order of remand regarding Plaintiff's first application for SSI benefits.

AR 488-490.  In its order, the Appeals Council also rendered Plaintiff's second application (filed

on March 16, 2001) as "duplicate" and vacated the ALJ's April 25, 2003, decision regarding

Plaintiff's second application.  AR 489.  The Appeals Council then remanded the case to an ALJ.

AR 489.

Following the remand, ALJ Baker held a hearing on September 24, 2003.  AR 554-573.

ALJ Baker again denied benefits on October 6, 2003.  AR 462-470.  On October 12, 2004, the

Appeals Council denied Plaintiff's request for review.  AR 449-451.

Hearing Testimony

*November 30, 2000*

ALJ Baker convened a hearing on Plaintiff's initial application on November 30, 2000, in

Stockton, California.  AR 24.  Plaintiff appeared with his attorney, Jeffrey Milam.  AR 26.

Plaintiff was born in Iraq on July 1, 1939, and was 61 years old at the time of the hearing.

AR 27.  Plaintiff completed 11 years of school in Iraq, which is the same as a 12-year education

in this country.  AR 28.  Plaintiff did not have any schooling in this country.  AR 28.  In the '60s,

Plaintiff had a private teacher in Iraq who taught him how to speak English.  AR 28.  He cannot write a letter or understand an English newspaper.  AR 29.

Plaintiff is married and lives in a house with his wife, his two daughters and his two sons. AR 29-30.  His wife does not work.  AR 30.

Plaintiff testified that he is right-handed.  AR 31.  He has worked as a machine operator and in the Belgian embassy.  AR 31.  He has not worked since December 1998.  AR 31.  He has a heart problem, pain in his chest and "short breath," which keep him from doing his past jobs. AR 31.  He also has pain in his left shoulder, left leg and hip.  AR 31.  He has a problem with his low back.  AR 32.

Plaintiff has breathing problems, but is not using any breathing inhalers.  AR 32.  He is taking medicines for his heart.  AR 33.  He does not have any adverse side effects from his medicines.  AR 33.  He has had shortness of breath for more than a year and a half.  AR 33.  He always has it.  AR 33.  He has chest pain many times a day, especially when he does something. AR 34.  He gets very tired, very quickly.  AR 34.  His shortness of breath is affected by things like dust, fumes or smoke.  AR 34.  When he is exposed to environmental things, he "cannot breath that well."  AR 34.  In the past, he had environmental things in the workplace.  AR 34. There was a chemical product used to clean computer chips.  AR 34.  It was a liquid with "a very strong smell."  AR 34.

Plaintiff testified that he has had low back pain "maybe seven years."  AR 34.  When he does something, he has it.  AR 35.  When he sits for a long time, when he stands in the bathroom and when he stands straight, he has pain.  AR 35.  When he does things for long periods, he has back pain.  AR 35.  It feels very sharp.  AR 35.

Plaintiff testified that he always has hip and left leg pain.  AR 35.  The pain feels "like burning."  AR 36.  Plaintiff has swelling in the lower part of the calf just above the left ankle, which was a surgery grafting site.  AR 36.

Plaintiff also testified that he always has left shoulder pain.  AR 37.  It hurts him and he "cannot move it better."  AR 37.  Plaintiff cannot use his left arm behind his back or for reaching overhead.  AR 37.  It is very difficult to use it to reach forward to push.  AR 38.  He cannot reach

forward repeatedly.  AR 38.  He has problems using his left hand to reach down and tie his shoe.  AR 38.  He puts his foot on something high and ties it.  AR 38.

Besides taking medications, Plaintiff does some physical exercises to relieve his pain.  AR 38.  The physical therapist at the hospital gave him exercises for his left shoulder.  AR 38-39.  When he has "too much pain on [his] shoulder," he does the exercises.  AR 39.  He does the exercises three times a day for an average of ten minutes each time.  AR 39.  It is motion exercise.  AR 39.  Sometimes he puts a pack of ice on his shoulder to help.  AR 39.  For his back, he just lies down for about 30 minutes, three to four times a day, every day.  AR 40.  The longest that he can be on his feet standing or walking is 30 minutes.  AR 40.  He can sit maybe one hour before he has to get up out of a chair.  AR 41.  He always has to change his position and keep his weight on his right hip.  AR 41.  He uses his right hand to lift.  AR 41.  He can lift and carry no more than a gallon of milk with both hands.  AR 41.  He can lift a gallon of milk.[2]  AR 41.

Plaintiff testified that his treating doctor is Dr. Threewitt.[3]  AR 41-42.  She is in family practice at the Stanislaus Medical Center.[4]  AR 41-42.  In the past, it was Drs. Payne and Eric Gracer.[5]  AR 42.

Plaintiff testified that on a normal day, he can iron his shirts and wash some plates.  AR 42.  Sometimes he can work in the garden.  AR 42.  He can plant flowers, but has to sit on his knees.  AR 43.  Sometimes he prunes and takes care of the flowers.  AR 43.  His sons also do it.  His sons mow the yard.  AR 43.  His daughters do the vacuuming and the cooking.  AR 43.  His sons do the grocery shopping, but sometimes he can do it.  AR 43.  Sometimes he goes alone to do the grocery shopping.  AR 43-44.  He lifts small things.  AR 44.

---

[2]The ALJ took judicial notice that a gallon of milk weighs about eight pounds.  AR 41.

[3]The transcript refers to this provider as "Threwit."  AR 41.  The medical records refer to the provider as "Threewitt."  AR 340.  For ease of understanding, the Court will refer to this provider as "Dr. Threewitt."

[4]The transcript refers to this facility as "Stanislaw Medical Center."  AR 42.  The medical records identify this facility as "Stanislaus County Health Services Agency."  AR 340.  For convenience, the Court will refer to this facility as "Stanislaus County Health Services Agency."

[5]The transcript refers to these providers as "Dr. Paine" and "Eric Gracier."  AR 42.  However, the medical records identify these providers as John Payne, M.D." and "Erik Gracer."  AR 290, 291, 380.  For convenience, the Court will use the names as found in the medical records.

Plaintiff attends church with other members of his family every Sunday.  AR 44.  He drives and has a driver's license.  AR 44.  He never has had any restrictions on his license.  AR 44.  He usually drives three times a week.  AR 44.  Sometimes he goes to visit his sister or his friends.  AR 44.  Some days he never goes out of the house.  AR 44.  He drove to the hearing.  AR 45.  It was about 30 miles.  AR 45.  He never goes farther than he went today.  AR 45.  He had trouble driving 30 miles with his left hand.  AR 45.  He just uses his right hand.  AR 45.  Sometimes he uses his left, but he cannot use it too much.  AR 45.  The problem with his left hand driving is his shoulder.  AR 45.

Plaintiff testified that he has a problem in his left hip.  AR 46.  He had been kicked.  AR 46.  He asked his doctor for an x-ray.  AR 46.  About three weeks prior to the hearing, she sent him for an x-ray of his back, but an x-ray also was taken of his hip.  AR 46, 47.  He has not been back to the doctor since the x-ray.  AR 47.

In response to questions from the ALJ, Plaintiff testified that he came to the United States in about 1992.  AR 48.  He was working for the Belgian embassy in Iraq where he did follow up dealing with the Iraqi government offices.  AR 48.  He testified that "Iraq is not like here to do your job with the computer or by phone.  You have to go to that office to talk with the people."  AR 48.  He was a "go between."  AR 48.  He spent maybe one hour a day sitting down.  AR 49.  The rest of the time he would be walking around the offices distributing letters.  AR 49.  He also delivered and received the diplomatic pouch from the airport.  AR 50.  He would have to carry or lift maybe 40 kilos, which is about 88 pounds.  AR 50.  He had to lift and carry greater weights in the job for the Belgian embassy than he did when he was assembling electronics.  AR 50.

Plaintiff testified that he has four adult children living with him.  AR 50.  The children work and contribute to the household.  AR 50-51.  He was laid off work on August 25, 1998.  AR 51.  It was a downsizing.  AR 51.  He has not worked since that time.  AR 51.

*January 29, 2003*

On January 29, 2003, ALJ Baker convened a hearing in Stockton, California on Plaintiff's second SSI application.  AR 517.  Plaintiff appeared with his attorney, Jeffrey Milam.  AR 519.  Vocational expert ("VE") Guy Deaner also appeared and testified.  AR 519, 538-551.

5

1     Plaintiff testified that he worked as an assembler in this country for five years.  AR 523.

2  He stopped doing that on August 28, 1998.  AR 523.  He has not been back to work since that

3  time.  AR 523.  He stopped because his health "doesn't help [him] to go back to work."  AR 523.

4     Plaintiff is married.  AR 523.  He lives in a house with his wife, his son and his two

5  daughters.  AR 523-524.

6     Plaintiff testified that he does not believe he would be able to go back to his assembly job

7  because he cannot work.  AR 524.  He has a problem with his leg and with his shoulder.  AR

8  524.  He has arthritis in his fingers.  AR 524.  If he uses them for two or three minutes, "they

9  stuck and pain also."  AR 524.  He has pain in his shoulder, hand, fingers and left leg.  AR 524.

10  The doctors do not know what is wrong with his left leg.  AR 524.  He has pain in his hip that

11  radiates through his left leg to his heel.  AR 524.  He has low back pain and thinks his hip pain is

12  associated with the low back pain.  AR 524-525.  He constantly experiences pain in these areas.

13  AR 525.  He thinks his pain has been getting worse.  AR 525.  The pain going down into his foot

14  started more than two years ago.  AR 525.

15     Plaintiff testified that he has "short breath and weak breath."  AR 525.  He talks to his

16  doctor about it.  AR 525-526.  His doctor sends him to Dr. Smith, a cardiologist.  AR 526.  The

17  doctor gave him "the treadmill" and said he was "okay."  AR 526.  The doctor has not talked

18  with him about any exposure to stress or to anxiety.  AR 527.  If he walks fast for two or three

19  minutes, he cannot breathe very well.  AR 527.  If he does an activity, he has the same problem.

20  AR 527.  If he does some "practice," like using his hands, shoulder or legs, it gives him "short

21  breath."  AR 527-528.  If he tries to move the lawn mower, he cannot move it 5 yards.  AR 528.

22     Plaintiff testified that smoke bothers him and he cannot breathe.  AR 528.  He does not

23  have any inhalers.  AR 528.  He has swelling in his right leg if he stands on his feet too long or

24  walks.  AR 528.  He cannot be on his feet more than 20 minutes.  AR 528.  He can be seated in a

25  chair for 15 minutes, but has to move his hip.  AR 528-529.  If the hearing took an hour, he

26  would not be able to stay in his seat for the whole hour.  AR 529.  He stands, walks a bit or lies

27  down.  AR 529.  He lies down at least half an hour four or five times a day.  AR 529.  His doctor

28  knows that he lies down, but says nothing about it.  AR 529.

1    Plaintiff testified that the heaviest thing he can lift is five pounds.  AR 529.  Dr. Head is

2    his main doctor.  AR 529.  Dr. Threewitt[6] left and now it is Dr. Head.  AR 529.

3    Plaintiff testified that his medicine does not reduce the pain level "too much."  AR 530.

4    It reduces it "some."  AR 530.  He has hemorrhoids because of the medicines.  AR 530.  They

5    give him a "hard stomach" and his bowel movements are hard.  AR 530.  His doctor said he was

6    right, but he had to take the medicines.  AR 530.  The Neurontin and Naproxen cause him

7    problems.  AR 530.  The doctor said he needed to keep on those.  AR 530.  If he does not take

8    the Naproxen, he has too much pain on the bones around his neck.  AR 531.  The doctor gave

9    him medicine to help relieve the hemorrhoids or the constipation.  AR 531.  Besides medicine

10   and lying down, Plaintiff uses heat when he has pain in his shoulder.  AR 531.  He has a plastic

11   bag with hot water in it.  AR 531.  He uses it twice a day when he has very strong pain.  AR 531.

12   He does not use any kind of cane, brace or crutch.  AR 531.  He does not use ice.  AR 531.  He

13   went to physical therapy two or three times and they were using ice, but it does not work with

14   him.  AR 531.

15   Plaintiff testified that he walks sometimes.  AR 531.  The doctor recommended it.  AR

16   532.  At home, most of the time he watches TV and sometimes reads an Arabic newspaper.  AR

17   532.  He goes to church every Sunday.  AR 532.  The service is an hour and a half.  AR 533.  He

18   has to sit.  AR 533.  His religion is sometimes to sit and sometimes to stand.  AR 533.  When he

19   has pain, he has to sit.  AR 533.  When he sits too much, he has pain and has to stand up.  AR

20   533.

21   Plaintiff testified that he sometimes irons his clothes.  AR 533.  His daughters do the

22   housework or laundry.  AR 533.  He used to do that type of work.  AR 533.  He has a yard and

23   sometimes puts in some flowers.  AR 534.  He has to sit in the yard.  AR 534.  He has not used

24   the lawnmower in two years or more.  AR 534.

25   In addition to church, he sits with his friends and neighbors.  AR 534.  He has a friend

26   about a quarter mile from his house.  AR 534.  He walks there.  AR 534.  He drives only three

27   miles to go "from Floyd to Scenic Hospital."  AR 534.  He drove to the hearing.  AR 534-535.

28   _____

[6]The transcript identifies this provider as "Dr. Threewit."

He has not been anywhere more than 30 miles because of his left leg and shoulder.  AR 535.  He has not gone on vacation since he has been in the United States.  AR 535.  Even when he was working, he spent his vacation at home.  AR 535.

Plaintiff testified that he has problems grasping things and writing.  AR 536.  He has problems reaching forward.  AR 536.  He has not tried reaching over his head.  AR 536.  He cannot use his left hand for washing dishes.  AR 536.

Plaintiff testified that he does not have mental problems.  AR 537.  He has problems with more complex things because he forgets.  AR 537.  He does not know what the problem is.  AR 538.  It began two years ago.  AR 538.

VE Guy Deaner, Ph.D., also testified.  AR 538.  The VE identified Plaintiff's past relevant work as an office assistant in Iraq as light, unskilled.  AR 538.  His work as a machine operator in the electronics industry was light, semi-skilled, SVP 4.  AR 538.  The VE used DOT 684.014, electronic component processor.  AR 539.  Plaintiff testified that he was a machine operator, pushing buttons on a machine.  AR 540.  He put frames on the machine, filled in the magazines, put the magazines on a tray and put them in the oven.  AR 540.  He worked on a machine that made computer chips.  AR 540-541.  It was a sitting and standing job, and he could sit and stand when he wanted.  AR 541.  The most he ever had to lift was 10 pounds.  AR 541.

Plaintiff testified that he came to the United States in '91.  AR 542.  Before that, he worked at the Belgian embassy in Iraq.  AR 542.  He was dealing with the government officers for the Belgian government, distributing letters and clearing Belgian goods from customs.  AR 542.  It was a "mostly walking" job, and he had to lift more than 20 kilos.  AR 542.

In the electronics job, Plaintiff worked at a machine with buttons on it.  AR 544.  He would receive frames of chips and put the chips in the machine.  AR 544.  The chips were more than ten different sizes.  AR 544.  The chips would go in the machine and come out the other side.  AR 544.  He would put in the magazines and press certain buttons on the machines.  AR 544.  The VE testified that this sounded like a machine operator and there is no DOT title that says machine operator in the electronics industry.  AR 544.  A fabricating machine operator would be a medium, SVP of 6.  AR 545.  The job that Plaintiff described did not seem to be at

that skill level. AR 545. The VE testified that the machine operator job that Plaintiff did was a four, semi-skilled, performed at the light level. AR 545.

For the first hypothetical, the VE testified that a person who could lift and carry 20 pounds occasionally, 10 pounds frequently, could stand or walk six hours in an eight-hour day, could sit six hours in an eight-hour day, and could climb, balance, stoop, kneel, crouch and crawl occasionally could do the machine operator job. AR 546.

For the second hypothetical, the VE testified that a person who could lift and carry about 25 to 30 pounds, could stand and/or walk with breaks every one to two hours for about four hours, could sit with breaks every two hours for about six hours, who might have difficulty in doing repeated bending, stooping, crouching and crawling and also might have difficulty in pushing and pulling heavy objects could do the machine work as described by Plaintiff. AR 546.

For the third hypothetical, the VE testified that a person who could lift 30 pounds occasionally, lift 10 pounds frequently, could stand and/or walk about six, sit about six, could climb, balance, stoop, kneel, crouch or crawl occasionally sounded like one already talked about. AR 547. The VE further testified that adding limited public contact to the three hypotheticals would not make any difference. AR 547.

In response to questions from his legal counsel, Plaintiff testified that the electronics employer is still there, but he did not think the same position would be available. AR 547. When he was working, there were at least 150 employees in that company, but now they only have 50. AR 548. In response to questions from Plaintiff's legal counsel, the VE testified that a person who was limited moderately in the ability to carry out and remember more than simple, repetitive one and two-step tasks could not do the job because it is semi-skilled work. AR 549.

For the next hypothetical from Plaintiff's counsel, the VE testified that if claimant had restrictions of the second hypothetical and also would have difficulty with more than occasional reaching of the left arm to out in front of him, he could not do the job. AR 549-550. The VE testified that because occasional is defined as up to one third of the work day, and Plaintiff's description sounded like he needed to use his hands the entire day, the VE did not think Plaintiff

could do the job.  AR 550.  The VE did not know if the job currently allowed for a sit/stand option.  AR 550.

*September 24, 2003*

Following remand by the district court and the Appeals Council, ALJ Baker convened a hearing on September 24, 2003, in Stockton, California.  AR 554-573.  Plaintiff appeared with his attorney, Jeffrey Milam.  AR 556.  VE Stephen Schmidt also appeared and testified.  AR 556, 563-572.

Plaintiff testified that he worked at an electronic company building computer chips.  AR 559.  He worked at a machine at the assembly line.  AR 559.  He worked marking the chips.  AR 559.  They used chemicals to print the chips before marking.  AR 559.  He worked at that company for five years.  AR 559.  He did not do other kinds of work in America.  AR 559.

Plaintiff's job at the Belgian embassy was "follow up."  AR 560.  When they had a problem in one of the offices, he had to "follow that problem."  AR 560.  For example, he had to get everything from customs that was coming for the embassy.  AR 560.  It was a standing and sitting job, "but almost standing" and "now you have to walk very much."  AR 560.  He had to lift paperwork.  AR 561.  He did some driving, too.  AR 561.  Plaintiff was in charge of facilitating paperwork to make sure the Belgian embassy could do what the Iraqi "customer" wanted.  AR 561.  The Iraqi government was making some kind of request to the Belgian government and Plaintiff was the middle man.  AR 562.  Plaintiff speaks and understands English, but very little reading and writing.  AR 562.

VE Stephen Schmidt also testified.  AR 563.  The VE testified that Plaintiff's electronics work was light, unskilled.  AR 563.  The VE assumed that Plaintiff's facilitator work at the Belgian embassy in Iraq was a light, semi-skilled type of office clerk position.  AR 564.

For the first hypothetical, the VE testified that a person with the residual functional capacity to perform a wide range of light work who could lift or carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk six hours in an eight-hour work day, could sit six hours in an eight-hour work day, and could climb, balance, stoop kneel, crouch and crawl occasionally could perform Plaintiff's past relevant work in electronics.  AR 566.

1       For the next hypothetical, the VE testified that a person who could sit for two hours at
2   one time, could stand or walk for two hours at one time, could sit for four hours in an eight-hour
3   period and could stand and/or walk four hours in an eight-hour period could not perform
4   Plaintiff's past relevant work.  AR 566.  The VE testified that there was no heavy work or
5   medium work that could be done.  AR 567.

6       For the next hypothetical, the VE testified that a person who could lift and carry about 25
7   to 30 pounds, could stand and/or walk with breaks every one to two hours for about six hours,
8   could sit with breaks every two hours for about six hours, had difficulty doing repeated bending,
9   stooping, crouching and crawling and also had difficulty pushing and pulling heavy objects could
10  perform Plaintiff's past relevant work in electronics.  AR 567.

11      For the next hypothetical, the VE testified that a person who could lift 20 pounds
12  occasionally, 10 pounds frequently, could walk about six hours and could sit about six hours with
13  only occasional postural limitations sounded the same.  AR 567.

14      For the next hypothetical, the VE testified that a person who could lift less than 5 pounds
15  frequently, less than 10 pounds occasionally, could reach 5 percent, handle 10 percent, kneel 60
16  percent, grasp 20 percent, push and pull 0 percent of an eight-hour day, could reach 10 seconds,
17  handle 5 minutes, feel 1 hour, push and pull 10 seconds and grasp 1 minute without resting could
18  not perform any of Plaintiff's past relevant work.  AR 568.  The VE further testified that limited
19  contact with the public would not affect Plaintiff's past relevant work as an electronics tech.  AR
20  569.

21      In response to questions from Plaintiff's legal counsel, the VE testified that a person with
22  moderate limitations in understanding and remembering detailed instructions, in carrying out
23  detailed instructions, in maintaining attention and concentration for extended periods, in
24  performing activities within a schedule, in maintaining regular attendance, in being punctual with
25  customary tolerances on the job, in working in coordination or proximity to others without being
26  distracted by them, in completing a normal work day and workweek without interruptions from
27  psychologically based symptoms, in performing at a consistent pace without an unreasonable

28

number and length of rest periods and in interacting appropriately with the general public could not do Plaintiff's past relevant jobs.  AR 570.

The VE also testified that if someone could stand for a total of six hours and would have to sit for at least two it would eliminate Plaintiff's past relevant work.  AR 572.

        Medical Evidence

 In May 1993, Plaintiff complained of leg and back pain.  AR 435.  In July 1993, Plaintiff complained of chronic back/buttock pain and hip pain.  AR 434.  In February 1994, Plaintiff again complained of low back/buttock pain.  AR 433.  Diagnostic images taken of his lumbar spine and pelvis were normal.  AR 432.  Subsequent lumbar spine views taken in June 1995, also were negative.  AR 703.

Between April and June 1996, Plaintiff complained of pain in his mid-back and elbows.  AR 702.  He was diagnosed with sciatica of the left side and left epicondylitis.  AR 702.  In July 1996, Plaintiff complained of left arm pain and left leg pain.  AR 701.  Left hip views taken on July 22, 1996, were negative.  AR 700.   Plaintiff again complained of left elbow pain in 1997.  AR 697.

In May and June 1998, Plaintiff saw James Carlson, M.D., on three occasions for chest pain and burning.  AR 129-130.  In May, Plaintiff also complained of back pain.  AR 130, 697.

On July 13, 1998, Plaintiff had an abnormal stress electrocardiogram.  AR 267-268, 688, 689-690.  The results suggested angina pectoris and myocardial ischemia.  AR 688.  Plaintiff was started on Ecotrin and Toprol.  AR 268.

On July 15, 1998, Samuel S. Baker, M.D., completed a cardiac evaluation of Plaintiff.  AR 265-266.  Plaintiff complained of exertional throat discomfort, which radiated to his shoulders and his upper left arm at times.  AR 265.  Following physical examination, a resting electrocardiogram and a treadmill test, Dr. Baker opined that Plaintiff had increasing angina pectoris, abnormal electrocardiogram and left hip pain that probably was sciatica.  AR 266.  Dr. Baker planned to perform a coronary angiogram and cardiac catheterization with possible balloon or stent revasculartization.  AR 266.

1    On July 20, 1998, Plaintiff had an abnormal ECG.  AR 152-153.  On that same date,

2    Plaintiff underwent a left heart cardiac catheterization procedure and rotational atherectomy of

3    the mid left anterior descending coronary artery and the first diagonal branch, which were

4    performed by Jack Tsuji, M.D., at Memorial Hospitals Association.  AR 132.  Plaintiff's

5    preoperative diagnosis was unstable angina pectoris with recent onset of substernal chest pain

6    and a markedly abnormal treadmill exercise test.  AR 139-142.

7    On July 23, 1998, Plaintiff was discharged from Memorial Hospitals Association.  AR

8    132-134.  On discharge, he was diagnosed with unstable angina pectoris due to near total

9    occlusion of the left anterior descending coronary artery and high-grade stenosis of the diagonal

10   branch.  AR 132.  Dr. Tsuji prescribed aspirin, Norvasc and Nitroglycerin and instructed Plaintiff

11   that he could return to work approximately 1 week following discharge.  AR 134.

12   On October 20, 1998, Plaintiff underwent a treadmill exercise test and echocardiogram.

13   AR 255-256.  His treadmill exercise test was positive with symptoms of throat pain.  AR 256.

14   Dr. Tsuji opined that this was typical of angina pectoris and "abnormal ST segment changes

15   diagnostic of myocardial ischemia."  AR 256.  In addition, Plaintiff had an abnormal stress

16   echocardiogram, which showed "exercise induced hypokinesis of the apical and adjacent

17   anteroapical and septal apical segments."  AR 256.

18   On November 3, 1998, Plaintiff saw Erik Gracer, M.D., at Stanislaus County Health

19   Services Agency.  AR 291.  Dr. Gracer assessed Plaintiff with increased angina, but noted that

20   Plaintiff currently was stable.  AR 291.

21   On November 4, 1998, Plaintiff saw W. Richard Smith, M.D., for a cardiology

22   consultation.  AR 409-411.  Plaintiff complained of a burning sensation that began in the upper

23   chest and moved into his throat, shoulders and left arm.  AR 409-411.  Dr. Smith ran a series of

24   tests and opined that Plaintiff needed cardiac catheterization and coronary angiography.  AR 411.

25   Stress and resting myocardial perfusion scans suggested anterior wall, anterior apical, inferior

26   wall, apical and septal ischemia.  AR 293-294.  A thallium treadmill exercise study also was

27   consistent with ischemia.  AR 295-296.  Cardiac rest and stress thallium imaging showed

28

possible apical ischemia.  AR 314.  His electrocardiogram was abnormal, showing significant sinus bradycardia.  AR 297.

On November 19, 1998, Plaintiff saw Dr. Gracer, who assessed Plaintiff's angina as stable, but indicated that Plaintiff was scheduled for "heart cath." AR 290.

On November 20, 1998, Plaintiff underwent an electrocardiogram, which revealed sinus bradycardia and U waves.  AR 292.  Chest X-rays showed sclerosis of the right first rib.  AR 311.

On November 25, 1998, Plaintiff had an abnormal ECG.  AR 221-226.  He was admitted for outpatient coronary angiography and cardiac catheterization.  AR 171.  The procedures revealed that Plaintiff had three-vessel arteriosclerotic coronary heart disease and anterior wall hypokinesis.  AR 207-208.  John Hamm, M.D., recommended that Plaintiff undergo coronary artery bypass surgery.  AR 171, 208.  On that same date, Noel L. Concepcion, M.D., evaluated Plaintiff for coronary bypass surgery.  AR 171-173.  Thereafter, on December 18, 1998, Dr. Concepcion performed Plaintiff's coronary artery bypass grafting x four.  AR 165-167.

Chest views taken on January 5, 1999, showed Plaintiff's interval sternotomy and a blunting of the right costophrenic angle.  AR 310.

On January 13, 1999, Plaintiff saw Dr. Concepcion for a postoperative visit.  AR 229.  Plaintiff had no complaints.  AR 229.  Subsequently, on January 15, 1999, Dr. Concepcion completed an unemployment insurance form for Plaintiff.  AR 390.  Dr. Concepcion opined that Plaintiff had been incapable of performing his regular work since December 18, 1998.  AR 390.  Dr. Concepcion estimated that Plaintiff would be able to resume his regular or customary work on March 22, 1999.  AR 390.

On January 29, 1999, Plaintiff saw Dr. Gracer for complaints of pain in his low back and his shoulders.  AR 288.  Plaintiff also complained of feeling weak and tired.  AR 288.

On February 23, 1999, Plaintiff saw Dr. Concepcion for another postoperative visit.  AR 228.  Plaintiff complained of easy "fatigability," which might have been due to deconditioning.  AR 228.  Dr. Concepcion opined that Plaintiff needed to exercise more.  AR 228.  Plaintiff was discharged back to the care of Drs. W. Richard Smith and Erik Gracer.  AR 228.

1    Chest views of Plaintiff taken on February 24, 1999, showed blunting of the posterior left

2    costophrenic angle, a sternotomy, a suggestion of underlying chronic lung disease and

3    nonspecific paratracheal thickening.  AR 308.

4         On March 5, 1999, Plaintiff saw Dr. Gracer for chronic back pain with sciatica.  AR 287.

5         On May 5, 1999, Plaintiff saw Dr. Gracer for his chronic low back pain and external

6    hemorrhoids.  AR 286.  Plaintiff complained of pain radiating from his left leg to his left heel.

7    AR 286.  Dr. Gracer prescribed Tylenol.  AR 286.

8         On May 20, 1999, Dr. Gracer and John Payne, M.D., completed a supplementary

9    certificate for the state Employment Development Department.  AR 380.  Drs. Gracer and Payne

10   estimated that Plaintiff would be able to perform his regular or customary work beginning

11   September 1, 1999.  AR 390.

12        On June 1, 1999, Plaintiff underwent a flexible fiberoptic colonoscopy with polypectomy.

13   AR 280.

14        On July 1, 1999, James Martin, M.D., completed an internal medicine evaluation of

15   Plaintiff.  AR 231-233.  Plaintiff complained of chronic low back pain for about 20 years.  AR

16   231.  Plaintiff also reported on his coronary artery disease.  AR 231.  Dr. Martin assessed

17   Plaintiff with coronary artery disease, status post coronary artery bypass grafting and chronic low

18   back pain with possible radiculopathy.  AR 233.  He recommended that Plaintiff be "restricted

19   from the workplace for a period of 8-12 months as he continues to recuperate from his recent

20   bypass surgery with reevaluation thereafter."  AR 233.  Dr. Martin also noted that Plaintiff had

21   long standing chronic low back pain and reevaluation with an orthopedist might prove useful.

22   AR 233.

23        On July 1, 1999, radiologist John S. Martin, M.D., took views of Plaintiff's lumbar spine.

24   AR 236.  Dr. Martin opined the Plaintiff had minimal degenerative spurring, but an otherwise

25   negative lumbosacral spine.  AR 236.

26        On July 6, 1999, Plaintiff saw Dr. Gracer and complained of lower back pain.  AR 285.

27   Plaintiff was prescribed Neurontin.  AR 285.

28        On July 7, 1999, Plaintiff had a "normal EKG."  AR 234-235.

1   On August 4, 1999, Plaintiff saw Dr. Gracer for complaints about his back and chest,

2   including sternum pain and a painful vein.  AR 284.  Chest views taken of Plaintiff on August

3   11, 1999, showed chronic lung disease and a sternotomy.  AR 303.

4   On August 25, 1999, Plaintiff saw Dr. Gracer and complained of his sternum hurting,

5   blood in his stool and a rash.  AR 283.

6   On August 26, 1999, Debal Basu, M.D., completed a consultative cardiology examination

7   of Plaintiff.  AR 238.  Dr. Basu noted that Plaintiff achieved only 65% of his maximal heart rate

8   and was unable to complete the treadmill test because of moderately severe right knee pain.  AR

9   238, 239-254.  At 65 %, Plaintiff's heart rate did not show any ischemic ST changes.  AR 238,

10   239-254.  Plaintiff did not develop any chest pain, but had occasional PVCs during exercise.  AR

11   238.

12   On September 23, 1999, Elpidio Fonte, M.D., completed a Physical Residual Functional

13   Capacity Assessment form.  AR 269-276.  Dr. Fonte opined that Plaintiff could lift and/or carry

14   20 pounds occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-

15   hour workday, could sit about 6 hours in an 8-hour workday and could push and/or pull without

16   limitation other than as shown for lift and/or carry.  AR 270.  Plaintiff occasionally could climb,

17   balance, stoop, kneel, crouch and crawl.  AR 271.  He had no manipulative, visual,

18   communicative or environmental limitations.  AR 272-273.  On November 5, 1999, a State

19   Agency physician affirmed Dr. Fonte's assessment.  AR 276.

20   On September 8, 1999, Dr. Gracer completed a supplementary certificate for the State

21   Employment Development Department.  AR 366.  Dr. Gracer estimated that Plaintiff would be

22   able to perform his regular or customary work on January 7, 2000.  AR 366.  Subsequently, on

23   September 24 and October 21, 1999, Dr. Gracer opined that Plaintiff's coronary artery disease

24   was stable.  AR 361, 364.

25   Plaintiff saw Dr. Gracer on December 15 and December 21, 1999, for complaints of chest

26   and shoulder pain.  AR 357, 360.  Stress and resting myocardial perfusion scans completed on

27   December 23, 1999, showed no strong evidence of ischemia or infarction.  AR 356.

28

1    In December 1999, Dr. Gracer responded to a request for medical information from the

2  State Employment Development Department.  AR 362-363.  Dr. Gracer opined that Plaintiff had

3  been incapable of performing his regular work since October 21, 1999.  AR 362.  He further

4  estimated that Plaintiff's disability would end on February 15, 2000.  AR 363.

5    On January 11, 2000, Plaintiff complained to Dr. Gracer of left shoulder pain.  AR 349.

6  He was prescribed Celebrex.  AR 349.

7    On January 20, 2000, Plaintiff underwent a cardiology follow-up with Dr. Smith.  AR

8  347-348.  Plaintiff complained that he was short of breath and feeling tired.  AR 347.  Dr. Smith

9  noted that Plaintiff was taking aspirin, Lipitor and Capoten.  AR 347.  Dr. Smith also reported

10  that Plaintiff's myocardial perfusion scan was normal and further cardiac evaluation was not

11  necessary at that time.  AR 348.

12    On February 24, 2000, Plaintiff sought treatment from Dr. Gracer for chronic left buttock

13  pain.  AR 346.  Plaintiff was shown stretching exercises.  AR 346.  Dr. Gracer noted that

14  Plaintiff's coronary artery disease was stable.  AR 346.

15    On April 27, 2000, Plaintiff saw Dr. Gracer and complained of left shoulder pain.  AR

16  345.  On examination, Plaintiff had limited extension and rotation.  Dr. Gracer assessed him with

17  left shoulder impingement syndrome and planned to refer Plaintiff to an orthopedist.  AR 345.

18    On May 24, 2000, Plaintiff saw Colleen Griffin, M.D., at Stanislaus County Health

19  Services Agency for complaints of shortness of breath and left shoulder pain.  AR 343.  On

20  examination, he had decreased abduction and internal rotation of his shoulder.  AR 343.  Dr.

21  Griffin noted that he does not touch his back.  AR 343.  Dr. Griffin assessed Plaintiff with left

22  shoulder impingement syndrome and indicated that his coronary artery disease was stable with

23  medication.  AR 343.  Views of Plaintiff's left shoulder taken that same day showed sclerosis of

24  the AC joint.  AR 344.  He had minimal degenerative change of the AC joint.  AR 344.

25    On June 26, 2000, Plaintiff saw Dr. Gracer for complaints of shortness of breath,

26  persistent chest wall pain, fatigue and left shoulder pain.  AR 341.

27    On August 8, 2000, Plaintiff saw Tanya Threewitt, M.D., at Stanislaus County Health

28  Services Agency.  AR 340.  Plaintiff complained of pain at his surgery site, increased shortness

of breath and fatigue.  AR 340.  He was prescribed Naproxen.  AR 340.  An echocardiogram on August 24, 2000, was unremarkable.  AR 754-755.

On September 6, 2000, Plaintiff saw Dr. Threewitt for complaints of increased shortness of breath, fatigue and incision pain.  AR 753.  Thereafter, on September 29, 2000, Dr. Threewitt completed a Medical Assessment of Ability to Do Work-Related Activities-Physical form.  AR 439-441.  Dr. Threewitt opined that Plaintiff could lift and/or carry less than 10 pounds occasionally ("very little"), could stand and/or walk three hours in an eight-hour day and could bend and balance occasionally, but he could not climb, stoop, crouch, crawl or kneel.  AR 439-440.  His pulling/pushing was impaired and he had environmental restrictions of machinery, temperature extremes, chemicals, dust, fumes, humidity and vibration.  AR 441.  His sitting was not affected.  AR 440.

On October 4, 2000, Plaintiff saw Dr. Smith for chest pain, tiredness and shortness of breath.  AR 747-750.  Dr. Smith noted that Plaintiff had hypertension and had been a smoker.  AR 747.  Dr. Smith conducted a treadmill exercise study.  AR 749, 751.  During the study, Plaintiff complained of throat discomfort.  AR 750.  Dr. Smith recommended a myocardial perfusion scan to determine the presence of ischemia.  AR 750.

On October 10, 2000, Plaintiff saw Dr. Threewitt for complaints of shortness of breath, fatigue and left leg pain.  AR 745.  Plaintiff was prescribed medication for his leg pain.  AR 745.  Dr. Threewitt noted that Plaintiff's hypertension was well controlled.  AR 745.  Views of Plaintiff's lumbar spine taken on the same day showed minimal degenerative change with vascular calcification of the lumbar spine.  AR 443.

On December 7, 2000, Plaintiff was evaluated by Dr. Smith due to continued chest pain.  AR 742-743.  Plaintiff underwent myocardial perfusion imaging, which suggested transient ischemic dilatation.  AR 740-741.  He also underwent a thallium study.  AR 744.

On December 11, 2000, Plaintiff saw Dr. Threewitt for left leg pain, increased shortness of breath and fatigue.  AR 739.  Dr. Threewitt prescribed Naproxen for Plaintiff's leg pain and noted that Plaintiff's hypertension was stable.  AR 739.

1    Dr. Smith completed a cardiac evaluation of Plaintiff on December 20, 2000.  AR 737-

2 738.  The evaluation showed an increase in lung uptake and slight prominence of the left

3 ventricle during stress.  AR 738.  Dr. Smith recommended cardiac catheterization.  AR 738.

4    Chest x-rays taken on January 8, 2001, were normal.  AR 731.  Plaintiff had spurs of the

5 thoracic spine and sternal sutures.  AR 731.  An electrocardiogram on the same date was within

6 normal limits.  AR 732.

7    On January 11, 2001, Plaintiff underwent left heart catheterization, left ventricular

8 angiography, coronary angiography and angiography of two sapenous vein grafts and a left

9 internal mammary artery graft, which were performed by Chester M. Boltwood, M.D.  AR 706-

10 709.  Dr. Boltwood concluded that Plaintiff had coronary artery disease and recommended

11 medical therapy.  AR 708.

12    On April 3, 2001, Plaintiff saw Dr. Threewitt for complaints of left hip and buttock pain.

13 AR 730.  Dr. Threewitt noted that Plaintiff's hypertension was stable.  AR 730.

14    A Physical Residual Functional Capacity Assessment form was completed on May 17,

15 2001.[7]  AR 719-725.  According to the form, Plaintiff could lift and/or carry 20 pounds

16 occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday,

17 could sit about 6 hours in an 8-hour workday, and could push and/or pull without limitation other

18 than as shown for lift and/or carry.  AR 720.  He occasionally could climb, balance, stoop, kneel,

19 crouch and crawl.  AR 721.  He had no manipulative, visual, communicative or environmental

20 limitations.  AR 722-723.

21    On June 13, 2001, Plaintiff saw Dr. Threewitt for complaints of left leg, left hip and ankle

22 pain.  AR 728.  Plaintiff was assessed with sciatica, hypercholesterolemia and hypertension and

23 was prescribed medications.  AR 728.

24    On June 21, 2001, Dr. Threewitt completed a questionnaire regarding Plaintiff's ability to

25 perform work.  AR 787.  Dr. Threewitt opined that Plaintiff had medical problems that precluded

26 him from performing any full-time work at any exertional level, including the sedentary level.

27 AR 787.  Dr. Threewitt identified Plaintiff's primary impairments as sciatica, hypertension and

28

[7]Page 8 of this form (AR 726) is missing from the record before this Court.

1   hypercholesterolemia.  AR 787.  Dr. Threewitt further opined that Plaintiff could sit 2 hours at a

2   time and could stand and/or walk 2 hours at a time.  He could sit 4 hours over an 8-hour period

3   and could stand and/or walk 4 hours over an 8-hour period.  AR 787.  Dr. Threewitt indicated

4   that Plaintiff had difficulty staying in any one position for a long time due to sciatica.  AR 787.

5   Dr. Threewitt indicated that Plaintiff had been disabled since August 2000, the first time Dr.

6   Threewitt examined Plaintiff, or perhaps earlier.  AR 787.

7         On August 10, 2001, Plaintiff saw Dr. Threewitt for hypertension and left hip pain.  AR

8   870.  Dr. Threewitt assessed him with sciatica and increased his Neurontin prescription.  AR 870.

9   Dr. Threewitt noted that Plaintiff had good control of his high cholesterol and hypertension.  AR

10   870.  He was to continue with his current medications.  AR 870.

11         On October 21, 2001, Usman Ali, M.D., completed a comprehensive internal medicine

12   evaluation of Plaintiff.  AR 788-791.  Plaintiff complained of coronary artery disease, left

13   shoulder joint pain and lower back and left hip joint pain. AR 788.  On examination, Plaintiff

14   was alert, awake and oriented.  AR 789.  He had some tenderness on palpation over the left

15   shoulder joint, left wrist joint and lower back.  AR 790-791.  Plaintiff also had some

16   paravertebral muscle spasm in the lower back.  AR 791.  Dr. Ali diagnosed Plaintiff with arthritis

17   in the left shoulder and left wrist joint, lower back pain, coronary artery disease and hypertension.

18   AR 791.  Dr. Ali opined that Plaintiff should be able to lift and carry about 25-30 pounds, should

19   be able to stand and/or walk with breaks every one to two hours for about six hours and should

20   be able to sit with breaks every two hours for about six hours.  AR 791.  Dr. Ali further opined

21   that Plaintiff might have difficulty in doing repeated bending, stooping, crouching, crawling and

22   in pushing and pulling of heavy objects.  AR 791.  Plaintiff had no speech or hearing restrictions.

23   AR 791.

24         On November 7, 2001, Gregory Fields, Ph.D., a licensed psychologist, conducted a

25   mental status exam of Plaintiff.  AR 793-795.  Plaintiff reported that he often worried about his

26   relatives in Iraq, but had not reported this worry to his doctor.  AR 793.  He felt sad about his

27   family members left in Iraq and self-reported several vegetative symptoms of a mood disorder.

28   AR 793.  On mental status exam, Plaintiff was alert and oriented to purpose, time and location.

1   AR 794.  Plaintiff denied major symptoms of depression or anxiety.  AR 795.  His affect was

2   euthymic.  AR 795.  Dr. Fields diagnosed "R/O Adjustment Disorder With Mixed Anxiety and

3   Depressed Mood, Enduring Circumstances."  AR 795.  Dr. Fields opined that Plaintiff's ability to

4   deal with the public, supervisors, and co-workers appeared to be somewhat limited.  AR 795.

5   Plaintiff likely would not have difficulty with one and two-step tasks.  AR 795.  He could handle

6   routine daily financial transactions.  AR 795.

7       On November 15, 2001, a Physical Residual Functional Capacity Assessment form was

8   completed.[8]  AR 798-804.  According to the form, Plaintiff could lift and/or carry 20 pounds

9   occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday,

10  could sit about 6 hours in an 8-hour workday and could push and/or pull without limitation other

11  than as shown for lift and/or carry.  AR 799.  Plaintiff occasionally could balance, stoop, kneel,

12  crouch and crawl.  AR 800.  He had no manipulative, visual, communicative or environmental

13  limitations.  AR 801-802.

14      On November 28, 2001, Plaintiff saw Dr. Threewitt and complained of left buttock pain

15  down to his left ankle.  AR 869.  Dr. Threewitt assessed Plaintiff with sciatica, high cholesterol

16  with good control, and hypertension.  AR 869.  He was prescribed medications.  AR 869.

17      On November 29, 2001, S. Yancha, M.D., completed a Psychiatric Review Technique

18  form.  AR 806-819.  Dr. Yancha concluded that Plaintiff had a disturbance of mood,

19  accompanied by a full or partial manic or depressive syndrome characterized by sleep

20  disturbance, decreased energy and difficulty concentrating or thinking.  AR 809.  Dr. Yancha also

21  determined that Plaintiff had an anxiety-related disorder that did not precisely satisfy the

22  diagnostic criteria.  AR 811.  Dr. Yancha opined that Plaintiff had mild to moderate restriction of

23  activities of daily living, mild to moderate difficulties in maintaining social functioning and mild

24  to moderate difficulties in maintaining concentration, persistence or pace.  AR 816.

25      On November 29, 2001, Dr. Yancha completed a Mental Residual Functional Capacity

26  Assessment form.  AR 820-823.  Dr. Yancha opined that Plaintiff had moderate limitations in the

27  ability to understand and remember detailed instructions, in the ability to carry out detailed

28

_____

[8]Page 8 of this form (AR 805) is missing from the record before the Court.

instructions, in the ability to maintain attention and concentration for extended periods, in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and in the ability to work in coordination with or proximity to others without being distracted by them.  AR 820.  He had moderate limitations in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  AR 821.  He also had moderate limitations in the ability to interact appropriately with the general public.  AR 821.  Dr. Yancha further opined that Plaintiff fell between not significantly limited to moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, in his ability to respond appropriately to changes in the work setting and in his ability to travel in unfamiliar places or use public transportation.  AR 821.

On January 11, 2002, Plaintiff saw Dr. Threewitt for sciatica, high cholesterol and hypertension.  AR 866.  He was prescribed Neurontin for his sciatica and continued on medications for his cholesterol and hypertension.  AR 866.  His hypertension was described as "stable."  AR 866.

On January 27, 2002, Plaintiff underwent an MRI of his L-spine.  AR 865.  The MRI revealed minimal degenerative change of the discs of the lower lumbar spine.  AR 865.

On January 30, 2002, Dr. Threewitt completed a physical medical report and a Medical Assessment of Ability to Do Work-Related Activities form.  AR 846, 847-851.  Dr. Threewitt opined that Plaintiff occasionally could lift and carry up to 10 pounds, but never could lift or carry 11 to 100 pounds.  AR 847-848.  Plaintiff could sit 2 hours total in an 8-hour workday, could stand 2 hours total in an 8-hour workday, and could walk 2 hours total in an 8-hour workday.  AR 848.  He could sit 2 hours at one time, could stand 2 hours at one time and could walk 2 hours at one time.  AR 848.  He never could climb, balance, stoop, crouch, kneel or crawl.  AR 849.  He continuously could reach, handle, feel, push/pull, hear and speak.  AR 849.  He also had environmental restrictions of moving machinery, dust, temperature extremes, fumes, vibrations and "Other."  AR 850.

On February 1, 2002, Plaintiff sought treatment from Dr. Threewitt.  AR 864.  He was assessed with sciatica, high cholesterol and stable hypertension.  AR 864.

On April 12, 2002, Plaintiff saw Dr. Threewitt for complaints of left leg and hip pain. AR 863.  Plaintiff was assessed with sciatica, high cholesterol, stable hypertension, a sebaceous cyst and a ganglion cyst.  AR 863.

On June 6, 2002, Plaintiff saw Dr. Threewitt for left shoulder pain.  AR 862.  He was assessed with left shoulder tendonitis, sciatica, hypertension and high cholesterol.  AR 862.

On August 27, 2002, Plaintiff saw Jonathan Head, M.D., at Stanislaus County Health Services Agency, for increased tiredness, shortness of breath and pain radiating from his left buttock down his left leg.  AR 858.  Dr. Head noted that Plaintiff's sciatica continued and that walking and standing caused him pain.  AR 858.  Dr. Head planned to send Plaintiff for stress testing for his coronary artery disease.  AR 858.

Plaintiff saw Dr. Head on October 8, 2002, for complaints of left shoulder pain radiating to his arm and neck.  AR 857.  On examination, Plaintiff had pain with external rotation.  Dr. Head assessed Plaintiff with left shoulder tendonitis/impingement and gave him an injection. AR 857.  Dr. Head indicated that Plaintiff had been to physical therapy and would be referred to "ortho."  AR 857.  Views of Plaintiff's left shoulder taken on October 9, 2002, showed minimal degenerative change of the left AC joint.  AR 856.

On October 17, 2002, Dr. Head completed a questionnaire regarding Plaintiff's ability to perform full-time work.  AR 852-853.  Dr. Head opined that Plaintiff's medical problems would not preclude him from performing sedentary work.  AR 852.  Plaintiff could sit all day during an 8-hour work day, but his ability to stand/walk was "very limited."  AR 852.  He frequently could lift less than 5 pounds and occasionally could lift less than 10 pounds.  AR 853.  During an 8-hour day, Plaintiff could reach for 5%, handle for 10%, feel for 60% and grasp for 20% of the day.  AR 853.  He could not push or pull, but he could reach for 10 seconds at one time, handle for 5 minutes at one time and push/pull for 10 seconds at one time.  AR 853.

On December 4, 2002, Plaintiff saw Dr. Head because of hemorrhoids and left shoulder and left leg problems.  AR 855.  Dr. Head indicated that Plaintiff's left shoulder and hip were

better with cortisone injections, his coronary artery disease was stable, his hypertension was well-controlled and he had a negative treadmill.  AR 855.

On February 10, 2003, Plaintiff saw Dr. Head for left shoulder pain.  AR 512.  Dr. Head noted that Naproxen and exercise helped with the pain.  AR 512.  Dr. Head also indicated that Plaintiff's hypertension was well-controlled.  AR 512.  In April 2003, Dr. Head again indicated that Plaintiff's hypertension was "well-controlled."  AR 511.

On July 23, 2003, Plaintiff saw Dr. Head for complaints of left hip and shoulder pain.  AR 508.  Hip views taken on July 24, 2003, were normal.  AR 507.

ALJ's Findings

The ALJ began his decision with a review of the procedural history of Plaintiff's applications for SSI benefits, including the district court remand order and the Appeals Council's remand order.  AR 465.  In his findings, the ALJ adopted and incorporated by reference his prior decisions dated January 23, 2001, and April 24, 2003.  AR 468.  The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.  AR 469.  The ALJ also found that Plaintiff's degenerative disc disease, left shoulder impingement syndrome and his status-post quadruple coronary artery bypass were considered "severe" impairments, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  AR 469.  The ALJ further found that Plaintiff's allegations regarding his limitations were not totally credible.  AR 469.  In so finding, the ALJ indicated that the issue was discussed in his prior decision and was not noted as a ground for remand.  AR 469.  The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a wide range of light work.  AR 469.  He could lift or carry 20 pounds occasionally and 10 pounds frequently, could stand or walk about 6 hours in an 8 hour workday and could sit about 6 hours in an 8 hour workday.  AR 469.  He occasionally could climb, balance, stoop, kneel, crouch and crawl.  AR 469.  Therefore, the ALJ concluded that Plaintiff was not precluded from performing his past relevant work as an electronic assembly worker and was not under a "disability."  AR 469.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence means more than a mere scintilla, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (internal quotation marks and citation omitted).  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the correct legal standards and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

1    C.F.R. § § 404.1520(a)-(f), 416.920 (a)-(f) (2003). Applying the evaluation process in this case,

2    the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since the alleged

3    onset of disability; (2) has an impairment or a combination of impairments that is considered

4    "severe" (degenerative disc disease, left shoulder impingement syndrome and status-post

5    quadruple coronary artery bypass) based on the requirements in the Regulations (20 C.F.R. §

6    416.920(c) (2003)); (3) does not have an impairment or combination of impairments that meets

7    or equals one of the impairments set forth in Appendix 1 to Subpart P of Part 404; and (4) is able

8    to perform his past relevant work as an electronic assembly worker. AR 469.

9           Here, Plaintiff argues that (1) the ALJ denied Plaintiff due process; (2) the ALJ

10   improperly evaluated the treating physicians' opinions; (3) the ALJ improperly evaluated

11   Plaintiff's testimony; (4) the ALJ improperly rejected vocational expert testimony; and (5) the

12   ALJ failed to develop the mental health record.

13                                          **DISCUSSION**

14   A.    Due Process - ALJ Bias

15          As an initial matter, Plaintiff submits that he did not receive a full and fair hearing on

16   remand because the ALJ had predetermined that Plaintiff was not disabled in prior related

17   proceedings. In essence, Plaintiff's argument is one of ALJ bias. This argument is unsupported

18   by the record. ALJs and other similar quasi-judicial administrative officers are presumed to be

19   unbiased. *Schweiker v. McClure,* 456 U.S. 188, 195 (1982). "This presumption can be rebutted

20   by a showing of conflict of interest or some other specific reason for disqualification." *Id.* The

21   burden of making such a showing rests with the party asserting bias. *Id.* at 196. Here, Plaintiff

22   suggests that because the ALJ denied benefits on his initial application, on his subsequent

23   application and following remand, he was denied due process. The ALJ's denials, however,

24   appear solely to be a reflection of the ALJ's findings regarding the medical evidence and hearing

25   testimony.[9] Plaintiff cites no evidence in the record or in the hearing transcripts to show that the

26   ALJ had a conflict of interest or any other basis for disqualification. Moreover, there is no

27

28          [9]The sufficiency of the ALJ's findings regarding the medical evidence and hearing testimony will be
     discussed below in greater detail.

                                                    26

evidence suggesting that the Plaintiff sought to disqualify the ALJ at any stage of the underlying proceedings.

Insofar as Plaintiff contends that the ALJ's October 6, 2003, decision confirms bias because the ALJ took exception to the Appeals Council's order, this contention is without merit. In his October 6, 2003, decision, the ALJ discussed the Appeals Council order finding the April 24, 2003, application to be "'duplicate.'" AR 465. The ALJ commented that he was "not sure what this means." AR 465. Contrary to Plaintiff's suggestion, this does not demonstrate that the ALJ was "implying ...legal insufficiency" of the Appeals Council remand order. Plaintiff's Opening Brief, p.7. The ALJ expressed his understanding that the Appeals Council "did not indicate any issues in the April 24, 2003 decision that needed to be addressed" and, thereafter, adopted and incorporated the April 2003, decision by reference. AR 465-466.

Plaintiff's suggestion that the ALJ was biased because he "noted on the record at the last hearing that he is [caught] in the 'revolving door system that they [SSA] have,'"is also without merit. Plaintiff's Opening Brief, p. 7. There is no indication from the ALJ's statement, without more, to show that the ALJ was biased against or had a conflict of interest specifically involving Plaintiff.

Additionally, Plaintiff alleges that the ALJ failed to review the entire evidentiary file or obtain all evidence from the intervening application. To support this allegation, Plaintiff cites two letters from his legal counsel to the ALJ. The first letter is dated December 11, 2000, and purports to file an x-ray report (AR 442). The second letter is dated September 19, 2003, and purports to file records and reports dated February 5, 2003 through August 7, 2003 and a medication list (AR 505). Plaintiff's citations do not demonstrate that the ALJ failed to review the entire record. At best, these citations show that Plaintiff submitted documentary evidence for the ALJ's consideration. Moreover, in the decision after remand, the ALJ averred that he considered "the entire record, including the prior ALJ decisions." AR 468.

As for Plaintiff's contention that the ALJ rejected the Appeals Council's order to allow his legal counsel opportunity to review the entire record, this is unsupported by the record. Plaintiff

cites nothing in the record, or otherwise, to demonstrate that the ALJ prevented counsel from reviewing the record. Rather, Plaintiff cites only to the Appeals Council's order (AR 489), which states, "[a]s appropriate, the representative will be given an opportunity to review the entire record." AR 489.

To the extent that Plaintiff disagrees with the ALJ's statement that his findings at Steps 1 through 3 do not require any assessment as they are not in dispute, Plaintiff does not identify any specific issues with regard to the ALJ's decision at Steps 1, 2 or 3 to be addressed by the Court. The ALJ adopted his previous decisions, which included an assessment of Steps 1 through 3 of the disability evaluation process. AR 15-16, 475-478. Additionally, the ALJ included findings related to Steps 1 through 3 in his October 2003 decision. AR 469.

B.    Opinions of Treating Physicians

Plaintiff alleges that the ALJ erred by rejecting the opinions of all five of his treating physicians and that those opinions are supported by substantial evidence. Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). The opinions of treating physicians should be given more weight than the opinions of physicians who do not treat the claimant. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995). Where the treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. Even if the treating physician's opinion is contradicted by another physician, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the physicians', are correct. *Embrey v. Bowen*,

849 F.2d 418, 421-22 (9th Cir.1988).

_____The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 n. 4 (9th Cir. 1990); *Gallant v. Heckler,* 753 F.2d 1450, 1454 (9th Cir. 1984).  In *Gallant,* the Ninth Circuit held that "the report of [a] non-treating, non-examining physician, combined with the ALJ's own observance of [the] claimant's demeanor at the hearing" did not constitute "substantial evidence" and, therefore, did not support the Commissioner's decision to reject the examining physician's opinion that the claimant was disabled.  753 F.2d at 1456.  Similarly, in *Pitzer,* the Ninth Circuit concluded that the non-examining doctor's opinion "with nothing more" did not constitute substantial evidence.  908 F.2d at 506 n. 4.

 As Plaintiff does not identify the names of the treating physicians at issue, or provide any analysis of their opinions, the Court will review only the treating physicians' opinions evaluated by the ALJ following remand--Drs. Gracer, Payne and Threewitt.  AR 466-468.

1.      Opinion of Drs. Gracer and Payne

Here, both Drs. Gracer and Payne offered diagnoses of Plaintiff's medical condition and assessments of his ability to work.  The record contains multiple reports and forms completed by Dr. Gracer between 1998 and 2000.  To that end, Drs. Gracer and Payne completed a joint assessment in May 1999 describing Plaintiff's diagnosis and indicating that Plaintiff would be unable to work until September 1, 1999.[10]  AR 380.  The ALJ rejected this opinion because it referred to Plaintiff's back pain, which the ALJ termed inconsistent with a diagnosis of coronary artery disease and inconsistent because it was not mentioned in a March 15, 1999, report.  AR 467.  That Plaintiff may have coronary artery disease and back pain does not equate with an inconsistency.  Moreover, that Plaintiff may not have had back pain in March, but had back pain in May, also does not signify an inconsistency in the opinion.

---

[10]The ALJ also analyzed a March 15, 1999, report of disability (AR 382), which the Appeals Council deemed 'similar to later ones by Dr. Gracer."  AR 489.  As the record does not identify the person issuing the opinion, and Plaintiff has not specified, the Court has not addressed this opinion in its analysis.

Dr. Gracer also issued an opinion in December 1999, which the ALJ did not give "much weight." AR 467. Dr. Gracer opined that Plaintiff was unable to work beginning October 21, 1999, and continuing through February 15, 2000, due to coronary artery disease, chronic ischemic heart disease and chest pain. AR 362-363. The ALJ rejected this opinion because it did not refer to the back pain listed in Dr. Gracer's May 1999 opinion and, thus, was inconsistent with the prior opinion. AR 467. That Plaintiff may not have had back pain in December 1999 does not render Dr. Gracer's opinion inconsistent with his May 1999 opinion. Moreover, Dr. Gracer noted Plaintiff's coronary artery disease in both opinions. AR 362, 380.

As to the ALJ's determination that Dr. Gracer's opinion lacked objective findings, this appears inconsistent with the record. Although the form completed by Dr. Gracer in December 1999 did not contain objective findings, Dr. Gracer's treatment records demonstrate that Plaintiff had coronary artery disease and complained repeatedly of chest pain. AR 283, 284, 351, 360.

The ALJ also rejected the May and December 1999 opinions because they related to an issue reserved to the Commissioner regarding Plaintiff's ability to work. AR 467. Although opinions as to whether an individual is unable to work are reserved to the Commissioner, such opinions from medical sources on the issue must not be disregarded. SSR 96-5p. The ALJ "is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner." SSR 96-5p. In evaluating the opinions of medical sources on issues reserved to the Commissioner, the ALJ must apply the applicable factors in 20 C.F.R. §§404. 1527(d) and/or 416.927(d). *Id.* The ALJ did not discuss these factors in rejecting the treating physicians' opinions, which warrants remand.

2.      Opinion of Dr. Threewitt

In the decision following remand, the ALJ assessed Dr. Threewitt's opinion of September 29, 2000, regarding Plaintiff's ability to do work-related activities. AR 439-441. The ALJ chose not give Dr. Threewitt's assessment "much weight" because of a lack of objective findings regarding Plaintiff's shortness of breath and inconsistency with Dr. Smith's report of January 20,

2000.[11]  AR 467-468.  The record demonstrates, however, that Plaintiff had chronic lung disease and complained of shortness of breath to not only Dr. Threewitt, but also Drs. Smith and Gracer. AR 208, 340, 341, 343, 347, 745, 747-750, 753.  Further, after Dr. Smith completed his assessment in December 2000, Plaintiff underwent cardiac catheterization in January 2001, which was performed by Dr. Boltwood.  AR 708.  Following the procedure, Dr. Boltwood recommended medical therapy for Plaintiff's coronary artery disease.  AR 708.

After rejecting Dr. Threewitt's assessment, the ALJ chose to give controlling weight to the decision of a non-examining State Agency physician, whose opinion supported a determination that Plaintiff could perform light work.  AR 466.  The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician. *Pitzer,* 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456.  Accordingly, remand is appropriate to allow the ALJ to address the opinion of  Dr. Threewitt.

To the extent that the opinions of Drs. Gracer, Payne and/or Threewitt may be contradicted by the State Agency physicians, the ALJ may not reject these opinions without providing "specific and legitimate reasons" supported by substantial evidence in the record.  If there is "substantial evidence" in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2) and/or 416.927(d)(2) (2003).  In that event, the ALJ is instructed by Section 416.927(d)(2) to consider the factors listed in Sections 416.927(d)(2)-(6) and in determining what weight to accord the opinion of the treating physician.  Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "[n]ature and extent of the treatment relationship" between the patient and the treating physician.  20 C.F.R. § 404.1527(d)(2)(i)-(ii) and 416.927(d)(2)(i)-(ii).  Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is "still

---

[11]The ALJ also discounted Dr. Threewitt's opinion, along with the opinions of Drs. Gracer and Payne, on the ground that Plaintiff's testimony was not wholly credible.  AR 466-467.  The ALJ's credibility determination will be discussed below in greater detail.

entitled to deference." SSR 96-2p; *Orn v. Astrue*, ___F.3d ___ (9th Cir. 2007) (2007 WL 2034287). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p; *Orn* at *6. Remand is appropriate to allow the ALJ to afford the proper weight to the opinions of Drs. Gracer, Payne and Threewitt.

C.    Credibility Determination

        Plaintiff argues that the ALJ failed to discuss or analyze his testimony in the decision after remand. Contrary to Plaintiff's assertion, the ALJ referenced Plaintiff's testimony from the April 2003 hearing and noted that he discussed Plaintiff's allegations in the prior decision. AR 469. The ALJ also adopted and incorporated by reference Plaintiff's prior hearing testimony. AR 465, 468.

        Insofar as Plaintiff alleges that Plaintiff's testimony was not solicited at the September 2003 hearing, this allegation is without merit. Plaintiff provided testimony at the hearing regarding his past work. AR 559-562. There is no indication in the record that the ALJ precluded Plaintiff from providing any additional testimony. Further, the hearing transcript does not indicate that Plaintiff requested the opportunity to provide any additional testimony regarding his allegations.

        Plaintiff also alleges that the ALJ failed to give adequate reasons for rejecting his credibility pursuant to the criteria delineated in *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). An ALJ is required to make specific findings assessing the credibility of a claimant's subjective complaints. *Ceguerra v. Sec'y of Health & Human Serv.*, 933 F.2d 735 (9th Cir. 1991). In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996). It is possible to suffer disabling pain even where the degree of pain is unsupported by objective medical findings. *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). "In order to disbelieve a claim of excess pain, an ALJ must make specific findings justifying that

1   decision." *Id*. at 602 (citing *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989). The

2   findings must justify convincingly the ALJ's rejection of the claimant's excess pain testimony. *Id*

3       An ALJ is not required to believe every allegation of disabling pain. "This holds true even

4   where the claimant introduces medical evidence showing that he has an ailment reasonably

5   expected to produce *some* pain." *Id*. at 603. However, to discredit a claimant's testimony when a

6   medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the

7   disbelief.'" *Morgan v. Commissioner of Social Sec. Admin.*,169 F.3d 595, 599 (quoting *Lester*, 81

8   F.3d at 834.)

9       Here, the ALJ adopted the credibility analysis from his decision issued in April 2003. AR

10  469. In the April 2003 decision, the ALJ rejected Plaintiff's testimony because not supported by

11  objective clinical findings. AR 480. An ALJ cannot disbelieve a Plaintiff's allegations based

12  solely on the medical record even though it is  certainly a valid consideration. *Rollins v.*

13  *Massanari*, 261 F.3d 853, 856-857 (9th Cir. 2001).

14      In evaluating credibility, Social Security Administration rulings specify the proper bases

15  for rejection of a claimant's testimony. *See* SSR 96-7p; *Orn* at *9. "An ALJ's decision to reject a

16  claimant's testimony cannot be supported by reasons that do not comport with the agency's rules."

17  *Orn* at *9. Accordingly, remand is appropriate for a consideration of Plaintiff's credibility that is

18  consistent with the agency's rules, including SSR 96-7p.

19
20  D.   VE Testimony

21      Next, Plaintiff argues that the ALJ erred by adopting a portion of the VE's testimony.

22  Plaintiff claims that the ALJ should have adopted "[h]ypothetical #13 from counsel," regarding

23  Plaintiff's mental restrictions.[12] Plaintiff's Opening Brief, p. 8. Plaintiff further contends that the

24  ALJ's RFC was not supported by credible medical evidence or substantial evidence. Plaintiff's

25  Opening Brief, p.10. "Hypothetical questions posed to the vocational expert must set out *all* the

26  limitations and restrictions of the particular claimant...." *Embrey*, 849 F.2d at 422. The testimony

27  _____

28      [12]Conversely, Plaintiff also asserts that substantial evidence supports a sedentary RFC, with which Plaintiff
    would be considered disabled pursuant to the Medical-Vocational Guidelines. Plaintiff's Opening Brief, p. 10.

of a VE "is valuable only to the extent that it is supported by medical evidence." *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982). Therefore, the VE's opinion about a claimant's residual functional capacity has no evidentiary value if the assumptions in the hypothetical are not supported by the record. *Embrey*, 849 F.2d at 422. Here, the ALJ adopted the hypothetical question that set out the limitations for which he found support in the record. For the reasons discussed above, however, the ALJ improperly discredited the limitations of Plaintiff's treating physicians and Plaintiff's testimony. Accordingly, once the ALJ makes a determination of the weight to afford the limitations expressed by these physicians, along with Plaintiff's credibility, it may be appropriate to adopt a different  hypothetical than that adopted here by the ALJ.

E.      Duty to Develop the Record

        Plaintiff contends that the ALJ had a duty to develop the mental health record. ALJs have a duty to develop the record only when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). Although Plaintiff appears to contend that the ALJ did not include Exhibit B12 in the claim file, the ALJ acknowledged this exhibit during the course of testimony and Plaintiff's legal counsel read directly from the exhibit during questioning of the VE. AR 569-570. There is no indication that the record was inadequate or ambiguous related to Plaintiff's mental health or that the ALJ did not consider the exhibit in question. Accordingly, the ALJ's duty to develop the record regarding Plaintiff's mental health was not triggered.

**RECOMMENDATION**

        Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence in the record as a whole and is not based on proper legal standards. Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be GRANTED and that JUDGMENT be entered for Plaintiff Salman Denka and against Defendant Michael J. Astrue. The Court further recommends that the action be REMANDED for proceedings consistent with this opinion. These findings and recommendations will be submitted to the Honorable Anthony W. Ishii, pursuant to the provisions

of Title 28 U.S.C. § 636(b)(l).  Within fifteen (15) days after being served with these findings and recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:      September 19, 2007                    /s/ John M. Dixon**

                                                   UNITED STATES MAGISTRATE JUDGE